**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

ASHLEY L. R.,[1]
      Plaintiff,

        v.                                  Civil No. 3:21-cv-00678 (REP)

KILOLO KIJAKAZI,
Acting Commissioner of Social Security,
      Defendant.

**REPORT AND RECOMMENDATION**

This is an action seeking review of the decision of the Commissioner of Social Security ("Commissioner") denying Plaintiff's application for a period of disability insurance benefits, disability insurance benefits, and supplemental security income under the Social Security Act ("Act"). At the time of her application date, Plaintiff was a twenty-nine-year-old high school graduate who previously worked as a receptionist. (R. at 208, 215, 243.) Plaintiff alleges she is unable to work because of a brain tumor/hamartoma, seizures, memory loss, depression, anxiety, difficulty concentrating, difficulty multitasking, and headaches. (R. at 241.)

On February 10, 2021, an Administrative Law Judge ("ALJ") issued a decision finding that Plaintiff was not disabled. (R. at 15-26.) This matter comes before the Court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) on cross motions for summary judgment, rendering the matter ripe for review.[2]

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that, due to significant privacy concerns in social security cases, federal courts should refer to claimants only by their first names and last initials.

[2] The administrative record in this case remains filed under seal, pursuant to E.D. Va. Loc. R. 5 and 7(C). In accordance with these rules, the Court will exclude personal identifiers such as Plaintiff's social security number, the names of any minor children, dates of birth (except for year

Plaintiff now seeks review of the ALJ's decision. (Pl.'s Mem. Supp. Mot. Summ. J. 7-16, ECF No. 17 ("Pl.'s Mem.").) For the reasons set forth below, the Court RECOMMENDS that Plaintiff's Motion for Summary Judgment (ECF No. 16) be DENIED, Defendant's Motion for Summary Judgment (ECF No. 19) ("Def.'s Mem.") be GRANTED, and the final decision of the Commissioner be AFFIRMED.

## I. PROCEDURAL HISTORY

Plaintiff filed an application for disability insurance benefits and supplemental social security income in October 2019, alleging disability beginning February 20, 2010. (R. at 208, 215.) The Social Security Administration ("SSA") denied Plaintiff's claim on April 16, 2020 (R. at 150) and again upon reconsideration on July 30, 2020. (R. at 172, 183.) Plaintiff requested a hearing before an ALJ, and a hearing was held on January 14, 2021. (R. at 32-54, 186.) At the hearing Plaintiff amended her alleged onset date to July 20, 2019. (R. at 45.) On February 10, 2021, the ALJ issued a written opinion, holding that Plaintiff was not disabled under the Act. (R. at 15-26.) Plaintiff requested review of the ALJ's decision. (R. at 206.) On August 23, 2021, the SSA Appeals Council denied it which rendered the ALJ's decision as the final decision of the Commissioner. (R. at 1-5.) Plaintiff now seeks judicial review pursuant to 42 U.S.C. §§ 405(g) and 1383(c).[3]

## II. STANDARD OF REVIEW

In reviewing the Commissioner's decision to deny benefits, a court will affirm the SSA's "disability determination 'when an ALJ has applied correct legal standards and the ALJ's factual

_____

of birth), and financial account numbers from this Report and Recommendation, and will further restrict its discussion of Plaintiff's medical information only to the extent necessary to properly analyze the case.

[3] 42 U.S.C. § 1383(c)(3) renders the judicial review provisions of 42 U.S.C. § 405(g) fully applicable to claims for supplemental security income.

findings are supported by substantial evidence.'" *Mascio v. Colvin*, 780 F.3d 632, 634 (4th Cir. 2015) (quoting *Bird v. Comm'r of Soc. Sec. Admin.*, 699 F.3d 337, 340 (4th Cir. 2012)). Substantial evidence requires more than a scintilla but less than a preponderance of evidence and includes the kind of relevant evidence that a reasonable mind could accept as adequate to support a conclusion. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012); *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996). Indeed, "the substantial evidence standard 'presupposes . . . a zone of choice within which the decision makers can go either way, without interference by the courts. An administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision.'" *Dunn v. Colvin*, 607 F. App'x. 264, 274 (4th Cir. 2015) (quoting *Clarke v. Bowen*, 843 F.2d 271, 272-73 (8th Cir. 1988)).

To determine whether substantial evidence exists, the court must examine the record as a whole, but may not "undertake to reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ]." *Hancock*, 667 F.3d at 472 (quoting *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005)).

In considering the decision of the Commissioner based on the record as a whole, the court must consider "whatever in the record fairly detracts from its weight." *Breeden v. Weinberger*, 493 F.2d 1002, 1007 (4th Cir. 1974) (quoting *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488 (1951)). The Commissioner's findings as to any fact, if substantial evidence in the record supports the findings, bind the reviewing court to affirm regardless of whether the court disagrees with such findings. *Hancock*, 667 F.3d at 476. If substantial evidence in the record does not support the ALJ's determination or if the ALJ has made an error of law, the court must reverse the decision. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

SSA regulations set forth a five-step process that the agency employs to determine whether disability exists. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *see Mascio*, 780 F.3d at 634-35 (describing the ALJ's five-step sequential evaluation). To summarize, at step one, the ALJ looks at the claimant's current work activity. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). At step two, the ALJ asks whether the claimant's medical impairments meet the regulations' severity and duration requirements. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). Step three requires the ALJ to determine whether the medical impairments meet or equal an impairment listed in the regulations. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). Between steps three and four, the ALJ must determine the claimant's residual functional capacity, accounting for the most the claimant can do despite her physical and mental limitations. §§ 404.1545(a), 416.925(a).

At step four, the ALJ assesses whether the claimant can perform her past work given her residual functional capacity. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). The burden of proof remains with the claimant through step four of the analysis, such that she must prove that her limitations preclude her from past relevant work. *Bowen v. Yuckert,* 482 U.S. 137, 146 n.5 (1987); *Hancock*, 2012 U.S. App. LEXIS 128, at *3 (citation omitted). If such work can be performed, then benefits will not be awarded, and the analysis ends at step four. §§ 416.920(e), 404.1520(e). However, if the claimant cannot perform her past work, the analysis proceeds to step five, and the burden then shifts to the Commissioner to show that the claimant is capable of performing other work that is available in the national economy. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).

### III. THE ALJ'S DECISION

The ALJ followed the five-step evaluation process established by the Act in analyzing Plaintiff's disability claim. (R. at 15-26.) *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015) (describing the ALJ's five-step sequential evaluation).

At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful activity[4] since the amended onset date, July 20, 2019. (R. at 17.) At step two, the ALJ determined that during the relevant period, Plaintiff suffered from the following severe impairments: "epilepsy; anxiety, adjustment disorder; conversion disorder,[5] pseudo-seizures (20 CFR 404.1520(c) and 416.920(c))." (R. at 17.) At step three, the ALJ determined that none of these impairments, individually or in combination, met or equaled a disability listing in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926). (R. at 18.)

---

[4] Substantial gainful activity is work that is both substantial and gainful as defined by the Agency in the C.F.R. Substantial work activity is "work activity that involves doing significant physical or mental activities. Your work may be substantial even if it is done on a part-time basis or if you do less, get paid less, or have less responsibility than when you worked before." 20 C.F.R. § 404.1572(a). Gainful work activity is work activity done for "pay or profit, whether or not a profit is realized." 20 C.F.R. § 404.1572(b). Taking care of oneself, performing household tasks or hobbies, therapy or school attendance, and the like are not generally considered substantial gainful activities. 20 C.F.R. § 404.1572(c).

[5] Conversion disorder is a condition in which a person has neurological symptoms that cannot be explained by medical evaluation. Symptoms usually begin suddenly, following a stressful event, and often include psychogenic seizures. THE MERCK MANUAL OF DIAGNOSIS AND THERAPY 1574-1575 (Robert S. Porter *et al.* eds., 19th ed. 2011). Psychogenic seizures outwardly appear similar to epileptic seizures, but are seizures caused purely by the emotions. Ronald P. Lesser, *Treatment and Outcome of Psychogenic Nonepileptic Seizures*, 3 Epilepsy Currents 198, 198-200 (Nov. 2003).

The ALJ then determined Plaintiff's residual functional capacity.[6] (R. at 20.) Based on the evidence in the record, the ALJ determined that Plaintiff had the residual functional capacity:

> [T]o perform a full range of work at all exertional levels but with the following nonexertional limitations: never climb ladders ropes scaffolds; no more than occasional exposure to extreme heat; avoid all exposure to heights hazards and moving machinery; can understand, remember apply and carry out simple repetitive tasks consistent with unskilled repetitive work for 2 hours at a time with normal breaks; can concentrate, persist and maintain pace to complete unskilled repetitive tasks that do not require production rate pace meaning fast pace; occasional contact with coworkers and public in settings where tasks involve work primarily with objects rather than people; able to adapt to occasional changes associated with unskilled repetitive work.

(R. at 20.) The ALJ explained that she determined Plaintiff's residual functional capacity after considering "all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence," in accordance with the regulations. (R. at 20.)

Based on her residual functional capacity findings, the ALJ concluded at step four that Plaintiff was not capable of performing past relevant work as a front desk receptionist. (R. at 24-25.) She explained that Plaintiff's residual functional capacity precluded her from actually or generally performing her past relevant work. (R. at 25.) At step five, the ALJ found that there are other jobs that exist in significant numbers in the national economy that Plaintiff can perform. (R. at 25-26.) The ALJ considered the testimony of a vocational expert, who opined that Plaintiff could

---

[6] Residual functional capacity is defined as "an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." SSR-96-8p. When assessing the residual functional capacity, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. *Id.* (footnote omitted).

perform the requirements of representative occupations such as router and circuit board taper. (R. at 25.) Therefore, the ALJ determined that Plaintiff was not disabled under the Act. (R. at 26.)

## IV. ANALYSIS

In challenging the ALJ's decision, Plaintiff argues two errors warrant remand. First, she asserts that the ALJ's "[residual functional capacity] determination is not supported by substantial evidence because she failed to properly evaluate the opinion evidence under the prevailing regulations and law and fail[ed] to create a logical bridge between the evidence and her conclusion." (Pl.'s Mem. at 1.) Specifically, Plaintiff charges the ALJ with cherry-picking evidence and "playing doctor" by substituting her medical opinion for that of the medical providers when she had a duty "to investigate the facts and develop the record . . . ." (Pl.'s Mem. at 11-12.) Moreover, Plaintiff argues that the ALJ failed to address the supportability and consistency factors when evaluating the medical opinion evidence of Dawen Bu, M.D. ("Dr. Bu") pursuant to 20 C.F.R. §§ 404.1520c(b)(2) and 416.920c(b)(2). (Pl.'s Mem. at 7-13.)

Second, Plaintiff asserts that the ALJ "failed to properly evaluate whether or not Plaintiff met or medically equaled Listing 11.02." (Pl.'s Mem. at 14-16) (Pl.'s Reply Mem. at 3 (ECF No. 20) ("Pl.'s Reply")). Defendant responds that the ALJ sufficiently articulated Dr. Bu's medical opinion in accordance with the regulations, and substantial evidence supports the ALJ's findings. (Def.'s Mem. at 13-18.) The Court finds that the ALJ did not err for the reasons that follow.

## A.     The ALJ Fully Developed the Record.

In addition to applying the correct legal standards in her analysis, an ALJ has an obligation "to explore all relevant facts and inquire into the issues necessary for adequate development of the record, and cannot rely only on the evidence submitted by the claimant when that evidence is inadequate." *Cook v. Heckler*, 783 F.2d 1168, 1173 (4th Cir. 1986) (emphasis added). Since *Cook*,

the Fourth Circuit has clarified that an ALJ "is not required to act as plaintiff's counsel," but must "fully and fairly develop the record" once a claimant has made prima facie showing of entitlement to benefits. *Rice v. Chater*, No. 94-2001, 1995 U.S. App. LEXIS 9829, at *5 (4th Cir. May 1, 1995) (citations omitted); *see also Bell v. Chater*, 1995 U.S. App. LEXIS 14322, at *12-13 (4th Cir. June 9, 1995).

 To determine "whether an ALJ has fully and fairly developed the record, the proper inquiry is whether the record contains sufficient evidence." *Anderson v. Astrue*, No. 10-3084, 2011 U.S. Dist. LEXIS 141527, at *6 (W.D. Ark. Oct. 4, 2011) (citations omitted). Where substantial evidence in the record supports an ALJ's finding as to a particular issue, the record is considered to be sufficiently developed. *See Mink v. Apfel*, 2000 U.S. App. LEXIS 11559, at *5 (4th Cir. May 22, 2000). However, the absence of substantial evidence to support an ALJ's finding not only exposes an ALJ's determination to potential reversal, but also may indicate that an ALJ has failed to develop the record sufficiently. *See Loving v. Astrue*, Civil Action No. 3:11cv411-HEH, 2012 U.S. Dist. LEXIS 134906 (E.D. Va. Sep. 20, 2012).

The agency requires the ALJ to use a "reasonable articulation standard" that "does not require written analysis about how [the ALJ] considered each piece of evidence." 82 Fed. Reg. 5844-01, at 5858. An ALJ has the discretion to seek additional or clarifying information if the information already in her possession is insufficient to determine whether the claimant is disabled or not. 20 C.F.R. §§ 404.1520b(b)(2)(i), 416.920b(b)(2)(i); *see e.g.,* 20 C.F.R. §§ 404.1520b(b)(1), 416.920b(b)(1) ("If any of the evidence in your case record, including an medical opinion(s) . . . . is inconsistent, we will consider the relevant evidence and see if we can determine whether you are disabled based on the evidence we have.").

An ALJ's failure to adequately develop the record warrants remand where the failure results in prejudice or unfairness to the claimant. *Sims v. Harris*, 631 F.2d 26, 28 (4th Cir. 1980); *see also Brown v. Shalala*, 44 F.3d 931, 935 (11th Cir. 1995); *Mann v. Astrue*, No. 5:07-201, 2008 U.S. Dist. LEXIS 26618, at *17 (S.D.W. Va. Mar. 31, 2008). In other words, remand is improper "unless the claimant shows that he or she was prejudiced by the ALJ's failure. To establish prejudice, a claimant must demonstrate that he or she could and would have adduced evidence that might have altered the result." *Carey v. Apfel*, 230 F.3d 131, 142 (5th Cir. 2000) (citations omitted); *Roseberry v. Colvin*, 2016 U.S. Dist. LEXIS 57787, at *14 (S.D.W. Va. Mar. 31, 2008).

A review of the administrative record demonstrates that the ALJ properly developed the record. First, she informed Plaintiff of the ALJ's duty to identify any treatment Plaintiff received that was not reflected in the file and to obtain any additional files before issuing her decision. (R. at 34-37, 188-193.) Plaintiff's attorney represented that Plaintiff had an opportunity to review the file before the hearing and declined to present any additional evidence. (R. at 36-37.) Second, the ALJ questioned Plaintiff extensively about her vocation, medical history, and symptoms. (R. at 38-49.) The ALJ learned that Plaintiff had a year of college education, which suggests that she is not amongst those claimants of limited education or cognition for whom an ALJ's duty to develop the record is even greater. (R. at 50.)

Third, the ALJ's review of Plaintiff's disability determination also demonstrates the completeness of the record. The ALJ discussed Plaintiff's history of epilepsy, anxiety, adjustment disorder, conversion disorder, pseudo-seizures, hypertension, cerebral hamartoma, and obesity. (R. at 17-24.) She explained that the medical record generally showed her to be well-oriented with intact memory, and that she adequately controlled her complex partial seizures with medication. (R. at 22-23.) The ALJ acknowledged the records which indicated that Plaintiff had reported

seizure-like aura symptoms, some tingling and numbness, and episodes of nonresponse and loss of consciousness. (R. at 21.) The ALJ further explained how the physical examinations were unremarkable. (R. at 21.)

The ALJ also discussed Plaintiff's psychiatric care with Prakash Bhushan Karn, M.D. ("Dr. Karn"). (R. at 21-22.) Plaintiff first presented to Dr. Karn for a psychiatric evaluation on May 4, 2020. (R. at 501.) At that appointment, she reported "worsening depression and anxiety for the past few months and also having what she calls 'pseudo seizure.'" (R. at 501.) The ALJ noted that Plaintiff's mental status examination indicated that she had a normal appearance, good eye contact, and was alert and oriented. (R. at 21-22, citing R. at 502.) Plaintiff was anxious, but in a stable mood, and had "no abnormal movements or psychomotor agitation/retardation." (R. at 22, citing R. at 501-02.) At a follow-up appointment with Dr. Karn on July 13, 2022, Plaintiff reported "having pseudoseizures approx. 5 in last 6 weeks. She is working with her therapist." (R. at 499.) Plaintiff's mood "remain[ed] depressed, anxiety present." (R. at 499.) Dr. Karn diagnosed Plaintiff with adjustment disorder, anxiety disorder, and a conversion disorder. (R. at 499.) The ALJ noted that Plaintiff's "treatment for her mental impairments has been very conservative. She has not been admitted for any inpatient psychiatric hospitalizations, partial hospitalization programs, or intensive outpatient treatment. She does not see a therapist for any individualized outpatient psychotherapy sessions[,]" and uses medication to manage her depression and anxiety. (R. at 22-23.) The ALJ wrote that Plaintiff's mental status examinations indicated "no evidence of significant mental status abnormalities." (R. at 22-23.)

Plaintiff argues that the ALJ should have contacted Dr. Bu to ask for clarifications for her concerns. (Pl.'s Mem. at 12.) Plaintiff has not demonstrated prejudice resulting from any alleged failure of the ALJ to fully develop the record, nor has she identified additional medical records in

10

existence within the relevant period for the ALJ to obtain. Instead, Plaintiff alleges that the ALJ should have explored her medical conditions more fully or sought further information to assist her in her findings. (Pl.'s Mem. at 12 and R. at 24.) This Court disagrees and finds that the ALJ was not required to develop the record further where there was sufficient evidence that enabled the ALJ to make a disability determination.

**B.      The ALJ Did Not Err in Her Residual Functional Capacity Assessment When She Evaluated Dr. Bu's Medical Opinion.**

    *1.  Evaluating Medical Opinion Evidence for Claims Filed on or After March 27, 2017.*

The regulations provide the framework for how an ALJ must evaluate medical opinion evidence. *Revisions to Rules Regarding the Evaluation of Medical Evidence*, 2017 WL 168819, 82 Fed. Reg. 5844-01 (Jan. 18, 2017); 20 C.F.R. §§ 404.1520c, 416.920c. These regulations provide that the ALJ will no longer "give any specific evidentiary weight...to any medical opinion(s) . . . ." *Revisions to Rules*, 2017 WL 168819, 82 Fed. Reg. 5844, at 5867-68; *see* 20 C.F.R. §§ 404.1520c(a), 416.920c(a). Instead, an ALJ must consider and evaluate the persuasiveness of all medical opinions or prior administrative medical findings from medical sources. 20 C.F.R. §§ 404.1520c(a), (b), 416.920c(a), (b).

Under the regulations,[7] the ALJ must evaluate each medical opinion and articulate the "persuasiveness" of all medical opinions by considering five factors: (1) supportability; (2) consistency; (3) relationship with the claimant; (4) specialization; and (5) "other factors that tend to support or contradict the medical opinion[,]" including familiarity with the other evidence or understanding of disability program policies and requirements. *Id.* §§ 404.1520c, 416.920c(a), (b), (c)(1)–(5). Supportability and consistency are the "most important" factors, and the ALJ must

---

[7] Because Plaintiff filed her disability claim after March 27, 2017, Section 416.920c, which sets forth revised rules regarding the assessment of medical opinion evidence, applies here.

discuss how these factors were considered in the written opinion. *Id.* §§ 404.1520c(b)(2), 416.920c(b)(2). Supportability and consistency are explained in the regulations:

> (1) *Supportability*. The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be.

> (2) *Consistency*. The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be.

20 C.F.R. §§ 404.1520c(c)(1)-(2), 416.920c(c)(1)-(2). The ALJ may, but is not required to, explain how the other factors were considered. 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2). However, when two or more medical opinions or prior administrative findings "about the same issue are both equally well-supported . . . and consistent with the record . . . but are not exactly the same," the ALJ is required to explain how "the other most persuasive factors in paragraphs (c)(3) through (c)(5)" were considered. 20 C.F.R. §§ 404.1520c(b)(3), 416.920c(b)(3).

### 2. *Dr. Bu's Medical Opinion*

Dr. Bu is a neurologist and treated Plaintiff from January 1, 2012 through at least the date of his medical evaluation report, January 8, 2021, in which he discussed Plaintiff's ability to complete work-related activities. (R. at 509-511.) In his report, Dr. Bu was asked to summarize Plaintiff's impairments and the clinical observations supporting his diagnoses. (R. at 509.) He remarked that Plaintiff had epilepsy, anxiety, depression, and a brain hamartoma, which were indicated on EEG and MRI imaging. (R. at 509.) When asked whether Plaintiff was "able to work full time (i.e. 7-8 hours per five days per week, or the equivalent, on a consistent scheduled basis)

at any level of exertion," Dr. Bu answered, "it depends." (R. at 509.) He explained "if she has frequent seizure episode or pseudoseizure, she cannot work." (R. at 509.)

Dr. Bu was asked to check "yes" or "no" to a series of questions reflecting Plaintiff's inability to work, given her impairments. (R. at 509.) He endorsed "yes" when asked if Plaintiff was unable to maintain a regular employment schedule, complete tasks in a customary production schedule, concentrate in a work setting, and regularly complete a normal workday. (R. at 509.) Notably, Dr. Bu previously endorsed "No" for the same answers but did not explain why he changed his answers. (R. at 509.)

When asked if Plaintiff's "above-described level of impairment [is] expected to last over 12 months from the date of onset," Dr. Bu answered "yes," and added that Plaintiff's prognosis for recovery was "unpredictable." (R. at 509.) He proceeded to explain that Plaintiff's typical seizure pattern "including all associated phenomena" included "complex partial seizure" and "pseudoseizure." (R. at 510.) Dr. Bu noted that Plaintiff experienced "alteration of awareness or loss of consciousness" and "transient postictal manifestations of unconventional behavior or significant interference with activity during the day." (R. at 510.) In the seizure questionnaire, Dr. Bu opined that Plaintiff experienced "daytime episodes with loss of consciousness and convulsive seizures" at a frequency of "almost every other day." (R. at 511.) He endorsed that there was EEG documentation of both grand mal (major) and partial (focal) motor seizures.[8] (R. at 511.)

---

[8] Generalized tonic-clonic (or "grand mal") seizures are caused by abnormal brain activity and involve the whole body; they can include rigid muscles, violent muscle contractions, and loss of alertness or consciousness. *See* Medline Plus, *Generalized Tonic-Clonic Seizure*, (http://www.nlm.nih.gov/medlineplus/ency/article/000695.htm) (last updated Feb. 4, 2020). Partial seizures also involve abnormal brain activity, but in a limited area, and can range from simple to complex; complex partial seizures can affect memory or consciousness. *See id.*, *Partial (Focal) Seizure*, at http://www.nlm.nih.gov/medlineplus/ency/article/000697.htm (last updated Feb. 4, 2020).

In her written decision, the ALJ summarized Dr. Bu's medical opinion evidence and found it "not persuasive because it is not supported by [Plaintiff's] treatment records, which do not reflect daytime episodes with loss of consciousness and convulsive seizures." (R. at 24.) The ALJ continued:

> [Plaintiff] recently reported non-epileptic events every other day. A 72-hour EEG monitor revealed such episodes were not epileptic events. Psychotherapy was recommended to address pseudoseizures, depression, and anxiety but [Plaintiff] did not comply. In addition, at section 4 of the medical source statement, "No" was checked for all items but then struck out and not initialed and "Yes" was checked for an unexplained reason.

(R. at 24.)

3. *The ALJ Did Not Cherry-Pick Evidence and Substantial Evidence Supports Her Evaluation of Dr. Bu's Medical Opinion.*

Plaintiff contends that the ALJ erred when she rejected Dr. Bu's medical opinion on the basis that it was inconsistent with Dr. Bu's own treatment notes regarding Plaintiff's reported loss of consciousness. (Pl.'s Mem. at 10.) Plaintiff alleges that the ALJ cherry-picked evidence by selectively disregarding three medical treatment notes that otherwise demonstrated Plaintiff's reported loss of consciousness. (Pl.'s Mem. at 10.) Given these treatment notes, Plaintiff argues that the ALJ "failed to show how limitations from pseudoseizures would differ at all from any other limitations from epileptic seizures," and furthermore "failed to explain how pseudoseizures or nonepileptic seizures would not cause the limitations opined by Dr. Bu." (Pl.'s Reply at 2.) According to Plaintiff, the ALJ mischaracterized the evidence because these records "clearly indicate[] loss of consciousness from her seizure activity," and her reasoning for rejecting Dr. Bu's opinion "is the complete opposite of the information contained in Dr. Bu's records." (Pl.'s Reply at 2; Pl.'s Mem. at 10.) Moreover, the ALJ "did not reconcile any of this evidence," and was "well within his [sic] purview to recontact Dr. Bu and ask for clarification in this matter if she had

concerns." (Pl.'s Mem. at 12.) Nonetheless, Plaintiff argues that the ALJ "brought up no concern regarding this opinion evidence during the hearing and did not attempt to recontact the source to resolve any ambiguity she might have had regarding this issue." (Pl.'s Mem. at 12.) As a result, the ALJ was "playing doctor with medical data" and "assum[ed] that Plaintiff could only possibly have the limitations alleged if the seizure activity was epileptic in form." (Pl.'s Mem. at 11.)

Cherry-picking occurs when an ALJ "locate[s] a single treatment note that purportedly undermines [the treatment provider's] overall assessment of [the plaintiff's] functional limitations . . ." *Hudson v. Colvin*, No. 12-cv-269, 2013 U.S. Dist. LEXIS 179614, 2013 WL 6839672, at *8 (E.D.N.C. Dec. 23, 2013) (quoting *Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011)); *see also Arakas v. Comm'r*, SSA, 983 F.3d 83, 99, 102 (4th Cir. 2020) (finding that the ALJ errs when misstating or mischaracterizing facts). Plaintiff points to treatment notes from three medical appointments that documented instances in which Plaintiff reportedly suffered loss of consciousness as support for her contention that the ALJ's evaluation of Dr. Bu's opinion is not supported by substantial evidence. (Pl.'s Mem. at 10.)

The ALJ cited to the treatment records identified by Plaintiff in her findings, which documented Plaintiff's reports of loss of consciousness as non-epileptic events. (R. at 21, 24 (citing R. at 519).) The ALJ examined treatment notes from a follow-up visit to Dr. Bu on May 5, 2020, who noted "[r]epeat MRI of brain showed no changes. However, she developed a few episodes of 'seizure-like movement with loss of consciousness.' Last episode was May 1, 2020. She had a total 5 episodes in last 30 days." (R. at 462.) Dr. Bu noted "this is a highly suspect nonepileptic event, due to the brain structural lesion, epileptic event cannot be entirely excluded." (R. at 462.) During a telehealth visit on November 12, 2020, Dr. Bu documented Plaintiff's report of "full loss of consciousness, which [he] believe[d] [was] not [an] epileptic event." (R. at 519.)

15

However, these treatment notes (recording nonepileptic events) do not undermine the ALJ's significant analysis of the record, which included evaluation of the consultative examinations, other medical opinion evidence, and Plaintiff's self-reported activities and subjective complaints. For example, the ALJ explained that Plaintiff's brain hamartoma is "stable," and her "complex partial seizures are well controlled with medication." (R. at 22.) She noted that video clips of Plaintiff's "episodes of nonresponsiveness and findings on a 72-hour EEG test" resulted in clinical findings that Plaintiff's "episodes are pseudoseizures." (R. at 22.) Nonetheless, the ALJ acknowledged that while Plaintiff's "difficulties in some areas of work related mental activities due to the combination of her pseudoseizures, anxiety, and depression" may impact her ability to perform a full range of work, these symptoms do not preclude her "from a range of unskilled work." (R. at 22.) In support, she pointed to Plaintiff's "range of activities of daily living, including preparing meals, cleaning and laundry, mowing, and vacuuming," as well as Plaintiff's ability to "care for her personal needs and . . . her pets." (R. at 23.) In addition to finding her mental status examinations unremarkable and her treatment to be conservative (medication and routine follow-up appointments), the ALJ concluded that Plaintiff's reported symptoms were not as severe as Plaintiff alleged. (R. at 23.)

Plaintiff argues that the ALJ should not have discounted Plaintiff's pseudoseizures simply because they are non-epileptic and contends that the ALJ "assum[ed] that Plaintiff could only possibly have the limitations alleged if the seizure activity was epileptic in form." (Pl.'s Mem. at 11.) However, the record clearly shows that Dr. Bu questioned the nature of Plaintiff's seizures based on generally normal EEG and MRI results and no abnormal movement in video clips Plaintiff provided to him for review. (R. at 15, citing R. at 345-46, 486-88, 519.) As Plaintiff points out, Dr. Bu noted that he could not determine if Plaintiff's loss of consciousness was due to seizure

activity or what is referred to as "pseudo-seizures;" events that occur because of psychological impairments, most often a reaction to extreme stress. As the ALJ explained, Plaintiff's psychiatrist diagnosed her with a conversion disorder and noted that Plaintiff "reported five pseudoseizures in the last six weeks." (R. at 21, citing R. at 499.) Indeed, the ALJ took note that Dr. Bu referred Plaintiff to psychotherapy to address the pseudo-seizures, but that Plaintiff did not follow the recommendation. (R. at 24, citing R. at 448.)

In evaluating Dr. Bu's treatment records, the ALJ was not unreasonable to discredit his opinion on the basis that it offered insufficient support for daytime episodes with loss of consciousness and convulsive seizures. (R. at 24.) Plaintiff asserts that this is a "gross misrepresentation of Dr. Bu's records." (Pl.'s Mem. at 10.) However, the ALJ could reasonably determine, based on a review of the record as a whole, that Dr. Bu's opinion was inconsistent with his own treatment records because they did not indicate daytime loss of consciousness or convulsive seizures. When accounting for the objective, medical, and nonmedical evidence, it is clear that the ALJ thoroughly reviewed the available record and determined, using the supportability and consistency factors articulated above, that the medical opinion of Dr. Bu was not persuasive. It is not for the Court to "re-weigh conflicting evidence, make credibility determinations, or substitute our judgment for that of the ALJ." *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996).

Ultimately, the ALJ provided adequate reasoning for finding Dr. Bu's opinion not persuasive, citing to specific evidence in the record to support her findings. In doing so, the ALJ sufficiently identified the evidence that supported her conclusion and built an accurate and logical bridge from that evidence to her conclusion that Plaintiff was able "to perform a full range of work" with nonexertional limitations. (R. at 20.) Importantly, substantial evidence, including

Plaintiff's medical records and reported activities support the ALJ's evaluation of Dr. Bu's opinion.

**C.     The ALJ Did Not Err in Failing to Find Plaintiff's Impairments Met or Medically Equaled Listing 11.02.**

Plaintiff next argues the ALJ erred by finding that Plaintiff's impairments did not meet or medically equal any listing, particularly Listing 11.02 (Epilepsy). (Pl.'s Mem. at 14-16.) Plaintiff claims her seizures, which are classified as psychogenic non-epileptic seizures (pseudo-seizures) are medically equivalent to epileptic seizures. (Pl.'s Mem. at 16.) Defendant responds that Plaintiff failed to meet her burden of proof to demonstrate that her impairments met or medically equaled the criteria of Listing 11.02. (Def.'s Mem. at 18.)

At step three of the evaluation process, an ALJ must evaluate the evidence to determine whether a claimant has an impairment or combination of impairments that meets or equals a listed impairment and is presumptively disabled. 20 C.F.R. § 416.920(a)(4)(iii). An ALJ must identify relevant listings and compare their medical criteria with the symptoms, signs, and laboratory findings of the claimant's impairments, as reflected in the medical evidence. *See Cook v. Heckler*, 783 F.2d 1168, 1173 (4th Cir. 1986). To meet a listing, a claimant's impairments "must meet all of the specified medical criteria." *Sullivan v. Zebley*, 493 U.S. 521 530, 110 S. Ct. 885, 107 L. Ed. 2d 967 (1990). To equal a listing, a claimant's impairment must be at least equal in severity and duration to the criteria specified in the listing. 20 C.F.R. § 416.926(a).

If the claimant satisfies the criteria under a listing and meets the twelve-month duration requirement, the Commissioner must find the claimant disabled without considering age, education and work experience. 20 C.F.R. § 404.1520(a)(4)(iii), (d). A claimant bears the burden of producing medical evidence establishing all of the requisite medical findings that her impairments meet or equal any particular listing. *Bowen v. Yuckert*, 482 U.S. 137, 146, n. 5, 107 S. Ct. 2287,

96 L. Ed. 2d 119 (1987). Equivalence is determined on the basis of a comparison between the "symptoms, signs and laboratory findings" about the claimant's impairment as evidenced by the medical records "with the medical criteria shown with the listed impairment." 20 C.F.R. § 404.1526. Further, equivalence depends on medical evidence only; age, education, and work experience are irrelevant. *Id.* § 404.1526(c).

The ALJ concluded Plaintiff's seizure disorder did not meet Listing 11.02 because "there is insufficient evidence" that Plaintiff's impairments met or medically equaled the requisite criteria. (R. at 18.) In support of this conclusion, the ALJ cited to exhibits 4F, 7F, 13F, and 14F, which included treatment records relevant to Plaintiff's partial complex seizures and non-epileptic seizures. (R. at 18.) The ALJ explained that "[t]he record shows that the claimant's partial complex seizures are controlled with medication. Although she has alleged a recurrence of seizures, they have been diagnosed as pseudoseizures and not epileptic seizures based on video clips and 72 hour EEG findings." (R. at 18.) (internal citations omitted). The Court finds the ALJ's explanation regarding Listing 11.02 is legally sufficient. The ALJ cited to specific objective medical findings and other evidence in the record – namely, Plaintiff's treatment records – in support of her conclusion. (R. at 18.) Indeed, the Court's own review of the record finds substantial support for the ALJ's finding that Plaintiff's impairments, either singly or in combination, failed to meet or medically equal the criteria of Listing 11.02.

Listing 11.02 requires evidence of epilepsy or an equivalent impairment with a detailed description of a typical seizure and evidence of either:

A. Generalized tonic-clonic seizures (see 11.00H1a),[9] occurring at least once a month for at least 3 consecutive months (see 11.00H4)[10] despite adherence to prescribed treatment (see 11.00C);[11] or

B. Dyscognitive seizures (see 11.00H1b),[12] occurring at least once a week for at least 3 consecutive months (see 11.00H4) despite adherence to prescribed treatment (*see* 11.00C); or

C. Generalized tonic-clonic seizures (see 11.001-11a), occurring at least once every 2 months for at least 4 consecutive months (see 11.00H4) despite adherence to prescribed treatment (see 11.00C); and a marked limitation in one of the following: 1. Physical functioning (see 11.00G3a); or 2. Understanding, remembering, or applying information (see 11.00G3b(i)); or 3. Interacting with others (see 11.00G3b(ii)); or 4. Concentrating, persisting, or maintaining pace (see 11.00G3b(iii)); or 5. Adapting and managing oneself (see 11.00G3b(iv));[13] or

---

[9] The listings define tonic-clonic seizures as "seizures. . . characterized by loss of consciousness accompanied by a tonic phase (sudden muscle tensing causing the person to lose postural control) followed by a clonic phase (rapid cycles of muscle contraction and relaxation, also called convulsions)." 20 C.F.R. Pt. 404, Subpt. P, App. 1, 11.00(H)(1)(a).

[10] The listings specify that the required number of seizures "must occur within the period [that the Commissioner is] considering in connection with [the claimant's] application or continuing disability review." 11.00(H)(4). The listings further specify that: (a) multiple seizures within a 24-hour period count as one seizure; (b) a continuous series of seizures without return to consciousness between seizures counts as one seizure; (c) a dyscognitive seizure that progresses into a tonic-clonic seizure counts as one seizure; (d) seizures occurring during a period of noncompliance with prescribed treatment do not count without good reason for the noncompliance; and, (e) psychogenic nonepileptic seizures or pseudoseizures do not count for Listing 11.02 and are instead considered under 12.00. 11.00(H)(4)(a)-(e).

[11] The listings require that the "limitations from [epilepsy, parkinsonian syndrome or myasthenia gravis] exist despite adherence to prescribed treatment." 11.00(C). "'Despite adherence to prescribed treatment' means that [the claimant has] taken medication(s) or followed other treatment procedures for [his or her] neurological disorder(s) as prescribed by a physician for three consecutive months" and his or her conditions continue to satisfy the criteria of one of the 11.00 listings. 11.00(C).

[12] Dyscognitive seizures denote "seizures. . . characterized by alteration of consciousness without convulsions or loss of muscle control." 11.00(H)(1)(b). During a dyscognitive seizure, "blank staring, change of facial expression, and automatisms (such as lip smacking, chewing or swallowing, or repetitive simple actions, such as gestures of verbal utterances) may occur." 11.00(H)(1)(b).

[13] The listings differentiate between marked limitations in physical functioning and marked limitations in mental functioning. 11.00(G)(2)(a-b). To have a marked limitation in physical functioning, a claimant must be "seriously limited in [his or her] ability to independently initiate,

D.  Dyscognitive seizures (*see* 11.00H lb), occurring at least once every 2 weeks for at least 3 consecutive months (see 11.00H4) despite adherence to prescribed treatment (see 11.00C); and a marked limitation in one of the following: 1. Physical functioning (see 11.00G3a); or 2. Understanding, remembering, or applying information (see 11.00G3b(i)); or 3. Interacting with others (see 11.00G3b(ii)); or 4. Concentrating, persisting, or maintaining pace (see 11.00G3b(iii)); or 5. Adapting and managing oneself (see 11.00G3b(iv)).

20 C.F.R. Pt. 404, Subpt. P, App. 1, 11.02(A)-(D).

Here, as the ALJ correctly noted, the objective medical evidence from the relevant period failed to establish that Plaintiff's impairments, either singly or in combination, met or medically equaled the criteria of Listing 11.02. (R. at 18.) Indeed, the video clips provided by Plaintiff to her doctor as well as the 72-hour EEG findings failed to record epileptic activity and were subsequently regarded as non-epileptic in nature. (R. at 18.)

Moreover, as the ALJ correctly noted, Plaintiff's partial complex seizures were controlled with medication. (R. at 18.) Although Plaintiff argues that she meets Listing 11.02(b) (dyscognitive seizures), the regulations specify that "psychogenic nonepileptic seizures and pseudoseizures are not epileptic seizures for the purpose of 11.02." (Pl.'s Reply Mem. at 4 (ECF No. 20); 20 C.F.R. § Pt. 404, Subpt. P, App. 1, 11.02(H)(1), (4)(e). *See also Crowder v. Berryhill*, No. 2:17-cv-00186, 2018 U.S. Dist. LEXIS 165410 (E.D. Va. May 17, 2018) (quoting *Coleman v. Astrue*, No. 3:05-0389, 2009 U.S. Dist. LEXIS 122290, 2010 WL 28567, at *13 (M.D. Tenn. Jan. 5, 2010) ("Given that the plaintiff's seizure episodes were not determined to be epileptic in nature, the ALJ was

---

sustain, and complete work-related physical activities . . . such as standing, balancing, walking, using both upper extremities for fine and gross movements, [or] using one upper and one lower extremity." 11.00(G)(2)(a). The Commissioner must consider "the overall effects of [a claimant's] neurological symptoms on the claimant's ability to perform such physical activities on a consistent and sustained basis." 11.00(G)(2)(a). To find a marked limitation in mental functioning, a claimant must present evidence that "due to the signs and symptoms of [his or her] neurological disorder, [he or she is] seriously limited in the ability to function independently, appropriately, effectively, and on a sustained basis in work settings." 11.00(G)(2)(b).

effectively precluded from applying Listings 11.02 and 11.03 since those listings deal with disability requirements specific to convulsive and nonconvulsive epilepsy.")

To the extent that Plaintiff argues that the substance of Dr. Bu's medical opinion supports her qualification under Listing 11.02, the Court notes that substantial evidence review does not require remand simply because substantial evidence supports a conclusion opposite to that of the ALJ. (Pl.'s Reply Mem. at 4); *see also Dunn v. Colvin*, 607 F. App'x. 264, 274 (4th Cir. 2015). Because substantial evidence supports the ALJ's conclusion regarding Listing 11.02, the Court finds remand is unwarranted. Moreover, the ALJ had no obligation to accept a physician's opinion that Plaintiff qualified as disabled under any listing, as the regulations reserve such a determination solely to the Commissioner. 20 C.F.R. §§ 404.1527(d)(1), 416.927(d)(1).

# V. CONCLUSION

For the reasons set forth above, the Court recommends that Plaintiff's Motion for Summary Judgment (ECF No. 16) be DENIED, Defendant's Motion for Summary Judgment (ECF No. 19) be GRANTED and that the final decision of the Commissioner be AFFIRMED.

Let the clerk forward a copy of this Report and Recommendation to Senior United States District Judge Robert E. Payne and to all counsel of record.

## NOTICE TO PARTIES

Failure to file written objections to the proposed findings, conclusions and recommendations of the Magistrate Judge contained in the foregoing report within fourteen (14) days after being served with a copy of this report may result in the waiver of any right to a de novo review of the determinations contained in the report and such failure shall bar you from attacking on appeal the findings and conclusions accepted and adopted by the District Judge except upon grounds of plain error.

/s/ MRC

Mark R. Colombell
United States Magistrate Judge

Richmond, Virginia
Date: July 11, 2022